IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,    )
    )
            Plaintiff,    )     Criminal Case No. 05-141-KI
    )
    vs.    )     OPINION AND ORDER
    )
IVAN CAM,    )
    )
            Defendant.    )
_____    )

Karin J. Immergut
United States Attorney
District of Oregon
Scott M. Kerin
Neil J. Evans
Assistant United States Attorneys
1000 S.W. Third Avenue, Suite 600
Portland, Oregon  97204

    Attorneys for Plaintiff

Marc D. Blackman
Ransom Blackman LLP
1400 Congress Center
1001 S.W. Fifth Avenue
Portland, Oregon  97204-1144

   Attorney for Defendant

KING, Judge:

  Defendant Ivan Cam was indicted for a knowing unauthorized discharge of a pollutant

into navigable waters in violation of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311(a),

1319(c)(2)(A).  Defendant entered a guilty plea to a superseding information subsequently filed

by the government charging him with negligently discharging a pollutant without a permit in

violation of 33 U.S.C. §§ 1311(a), 1319(c)(1)(A).  Before the court is defendant's Motion to

Withdraw Plea of Guilty (#85).

**BACKGROUND**

  Defendant was indicted on April 6, 2005 for discharging dredge and fill material on tax

lots 800 and 500 (Count One) (referred to by the government as the "northern site") and tax lots

1800, 1700, 1600, and 200 (Count Two) (referred to by the government as the "southern site").

These were felony counts.

  When Corrie Veenstra, Enforcement Project Manager for the Corps, first visited the

southern site (the "affected area") on June 14, 2004, she observed approximately one acre of

disturbance, including a small excavator buried up to its cab in one of several water-filled holes

measuring about 20 feet in diameter.

Page 2 - OPINION AND ORDER

The government later concluded that the disturbance to the affected area covered 1.33 acres. The disturbance began just south of defendant's residence (on tax lot 1700) extended east and west to the wetlands on neighboring properties (tax lots 1800 and 1600) and extended down to and into the unnamed tributary (tax lot 200). Tax lot 1700 begins 70 feet from the lip of the unnamed tributary on tax lot 200. James Goudzwaard, Wetland Specialist with the U.S. Army Corps of Engineers ("Corps"), calculated the affected acreage by taking measurements at the site with a tape measure and later transposing the measurements to an enlarged aerial photograph, and then calculating the total area of impact with a planimeter. Defendant's expert, Jay McCaulley, contends the area affected by defendant's activities was only .1 acre. He came to this conclusion by "examining the photographs and schematic drawings prepared by law enforcement officers at the time of the activity and the survey map" prepared by the remediation consultant. Supp. McCaulley Aff. ¶ 12f.

The affected area abuts an unnamed tributary. The unnamed tributary travels 1.75 uninterrupted miles from the affected area to the Pudding River, passing through four culverts along the way. The point at which the unnamed tributary enters the Pudding River is 32 miles from the Willamette. Some properties along the unnamed tributary have been certified by the Natural Resources Conservation Service ("NRCS") as prior converted cropland.

On May 12, 2007, Veenstra measured the flow of water in the unnamed tributary at the location of the affected area and, depending on how she calculated it, concluded that the flow was either 3.55 or 7.1 cubic feet per second. She also found the width of the channel to be 10 feet and the depth to be 3 feet.

Page 3 - OPINION AND ORDER

Neither the unnamed tributary nor the Pudding River has been surveyed for fish. Oregon Department of Fish and Wildlife (ODF&W) assumes the waters are fish bearing based on the habitat and condition of the water. The Pudding River has documented evidence of rearing habitat for spring Chinook and winter steelhead. The 2006 Pudding Watershed Assessment identified the Pudding River as a migratory corridor for spring Chinook, and the watershed as an "important area for winter steelhead populations." Veenstra Aff., Ex. 9 Part I, at 72, 104.

At his arraignment on April 22, 2005, defendant's pretrial release was revoked for disturbing the alleged wetlands. He was released on April 26, 2005. He came to court again on July 25, 2005 for disturbing the wetlands, but the court merely admonished defendant and did not otherwise sanction him. On August 17, 2005, defendant's supervision was revoked again for digging a trench through the wetlands, removing vegetation, and building retaining walls, either personally or by directing others to do so. He was not released from custody until August 30, 2005.

On June 19, 2006, the Supreme Court issued its most recent opinion on CWA jurisdiction, Rapanos v. United States, 126 S. Ct. 2208 (2006).

On July 24, 2006, defendant's pretrial release was revoked yet again when he or someone under his supervision operated and buried excavators in the wetlands.

In responding to a plea offer, defendant's counsel argued to the United States Attorneys' Office that the Supreme Court in Rapanos significantly narrowed the definition of "waters of the United States," that the affected area did not constitute a "water of the United States," but "a reasonable disposition barring any further litigation would allow [defendant] to enter into a

diversion with the government to resolve the federal indictment and allow the civil action to proceed separately." Gov. Ex. 17 at 2-3.

On August 15, 2006, a superseding information was filed, charging defendant, in two counts, with violating the CWA by negligently discharging a pollutant into a navigable water on only tax lots 1800, 1700, 1600 and 200 (the southern site). The First Count covers the period of October 1, 2003 through April 5, 2005, and the Second Count covers the period of July 18, 2006 through July 24, 2006. Defendant entered a guilty plea on August 16, 2006, and following his guilty plea he was released from custody.

> As part of his guilty plea, defendant admitted that, during two separate periods of time, he
>
> negligently discharged, and caused to be discharged, pollutants, including dredged and fill material, from a point source on the Southern unnamed tributary to the Pudding River, at or about a parcel of land located near Howell Prairie Road, south of Mt. Angel-Gervais Road, in Marion County, Oregon, and located on Marion County tax lots 1800, 1700, 1600, and 200, **into navigable waters**, including wetlands, without a permit.

Plea Agreement, ¶ 4 at 2 (emphasis added). Defendant also admitted that he was "freely and voluntarily accept[ing] the terms and conditions of [the] please offer" and was pleading guilty because he is "in fact . . . guilty." Plea Agreement, Acceptance at 5. A sentencing hearing was scheduled for November 1, 2006.

On September 5, 2006, defendant did not appear at a violation hearing to address another allegation that he violated pretrial release conditions, for again operating an excavator in the wetlands. On September 11, 2006, the court found defendant in violation of pretrial release conditions, but consolidated sentencing on the violation with the sentencing date.

Page 5 - OPINION AND ORDER

The Corps issued a total of 22 cease and desist orders, including two after defendant entered his guilty plea. Veenstra testified that defendant had buried in the affected area approximately ten pieces of heavy equipment, such as excavators, bobcats, and backhoes, during that time. Restoration work on the property took place in August of 2006.

The sentencing hearing was moved to January 2, 2007. Defendant obtained new counsel. Sentencing was rescheduled again, to March 23, 2007. On March 14, 2007, defendant filed this motion to withdraw his guilty plea. After several months of investigation, the government filed a response, and defendant filed a reply. The court visited the site on October 17, and held a two-day in-court hearing on October 17 and 18, 2007.

## LEGAL STANDARDS

A defendant may withdraw his plea if "defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Cr. P. 11(d)(2)(B). The defendant bears the burden, and the decision is within the discretion of the court. "Fair and just" reasons allowing withdrawal of a guilty plea include "inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." United States v. Garcia, 401 F.3d 1008, 1011 (9th Cir. 2005) (quoting United States v. Ortega-Ascanio, 376 F.3d 879, 883 (9th Cir. 2004)). There is generally a strong preference to preserve the guilty plea, given the protections surrounding the decision to enter such a plea. United States v. Hyde, 520 U.S. 670, 676 (1997).

## DISCUSSION

The CWA makes it unlawful to "discharge" a "pollutant," defined to include "dredged spoil," from a "point source" into a "navigable water" except as otherwise permitted by the

Page 6 - OPINION AND ORDER

statute.  33 U.S.C. § 1311(a); 33 U.S.C. § 1362(6); 33 U.S.C. § 1362(12).  "Navigable water" is defined to mean "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

Defendant seeks to withdraw his guilty plea for three reasons:  the Corps kept internal regulatory guidance from him; under Rapanos the federal government has no jurisdiction over the affected area; and the affected area is exempt from the CWA as "prior converted cropland."

I.     Reasons for Requesting Withdrawal of Guilty Plea

Defendant asserts a number of reasons to justify his request, but all go to the question of what he considers to be this court's subject matter jurisdiction.  Specifically, defendant states that when he entered his guilty plea he "was unaware of information in the possession of the government that demonstrated that the federal court did not have jurisdiction under the CWA over the area and activity involved in his prosecution."  D.'s Mem. in Supp. of Mot. to Withdraw Plea of Guilty at 3.  He contends this might be due to "inadequate investigation" by his previous counsel or the fact that the government withheld information from him.  Nevertheless, he clarified at oral argument that he is not attempting to withdraw his guilty plea on the basis of ineffective assistance of counsel.  Rather, he insists that he has identified a fair and just reason because he entered a guilty plea to a charge over which this court had no subject matter jurisdiction.

In every federal criminal prosecution, however, this court's subject matter jurisdiction arises from 18 U.S.C. § 3231.  See United States v. Moses, 496 F.3d 984, 987 (9th Cir. 2007) (district court had jurisdiction over criminal CWA case pursuant to 18 U.S.C. § 3231).  That statute provides, "The district courts of the United States shall have original jurisdiction,

exclusive of the courts of the States, of all offenses against the laws of the United States."  18

U.S.C. § 3231.  Defendant's argument actually goes to the question of whether the government

has regulatory authority over the affected area under the CWA, "but the existence of regulatory

power differs from the subject-matter jurisdiction of the courts."  Hugi v. United States, 164 F.3d

378, 380-81 (7th Cir. 1999).  Instead,

> [T]he nexus with interstate commerce, which courts frequently call the
> "jurisdictional element," is simply one of the essential elements of [the offense].
> Although courts frequently call it the "jurisdictional element" of the statute, it is
> "jurisdictional" only in the shorthand sense that without that nexus, there can be
> no federal crime . . . . It is not jurisdictional in the sense that it affects a court's
> subject matter jurisdiction, *i.e.* a court's constitutional or statutory power to
> adjudicate a case, here authorized by 18 U.S.C. § 3231.

Id. (quoting United States v. Martin, 147 F.3d 529, 531-32 (7th Cir. 1998)); see also United States

v. Ratigan, 351 F.3d 957, 963 (9th Cir. 2003) (relying on Hugi to find, in a bank robbery case, that

failure to prove bank was FDIC-insured did not undermine court's jurisdiction).

Accordingly, the gravamen of defendant's complaint goes to the sufficiency of the

government's evidence to prove an element of the crime–whether the affected area constitutes

"waters of the United States" under the CWA.  See United States v. Moses, 496 F.3d at 987 (in

CWA criminal prosecution, defendant "attacks his conviction on the ground that the evidence

does not support a determination that the portion of Teton Creek that he manipulated constitutes

a water of the United States").  Typically, "once a defendant pleads guilty in a court which has

jurisdiction of the subject matter and of the defendant, . . . the court's judgment cannot be

assailed on grounds that the government has not met its burden of proving so-called jurisdictional

facts."  Hugi, 164 F.3d at 381 (internal quotation marks omitted).

Furthermore, while an intervening Supreme Court decision could constitute a "fair and just" reason to allow withdrawal of a guilty plea, defendant is not faced with that circumstance. See United States v. Ortega-Ascanio, 376 F.3d at 887 (reversing district court, intervening Supreme Court decision overruling Circuit precedent constitutes "fair and just" reason). Rather, plaintiff entered his guilty plea two months after Rapanos was issued, and after his counsel had analyzed it and concluded that it was in defendant's best interests to resolve the indictment with a plea agreement. In an abundance of caution, however, I evaluate below defendant's claim that the government lacked regulatory jurisdiction over the affected area under the CWA, to ensure that I can accept his guilty plea in good conscience.

Finally, newly discovered evidence may be a viable basis on which defendant may request to withdraw his guilty plea. Defendant contends that the government failed to disclose 2003 guidance the EPA and the Corps issued after the Supreme Court's decision in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159 (2001) ("SWANCC"), and failed to disclose 2006 internal interim guidance issued by the Corps after the Supreme Court's Rapanos decision. Defendant argues the government's failure to hand over these documents is tantamount to an admission that it lacked CWA jurisdiction over the affected area, that the guidance constitutes exculpatory material, and that without the guidance his plea was not knowing and voluntary. I evaluate this contention next.

II.    Whether Withholding Guidance Constitutes a "Fair and Just" Reason

Defendant contends that the government withheld two separate guidance documents, one issued after SWANCC and one issued after Rapanos.

Page 9 - OPINION AND ORDER

The published guidance following <u>SWANCC</u> directed staff to obtain approval from Headquarters before asserting jurisdiction over isolated waters that were both intrastate and non-navigable.  68 Fed. Reg. 1991, 1995 (January 15, 2003).  This guidance was not provided to defendant prior to his guilty plea, nor had Corps' field staff obtained approval from Headquarters.

The internal interim <u>Rapanos</u> guidance, issued July 5, 2006, directed Corps' personnel to continue settlement and inspections so long as personnel did not need to take a position on CWA jurisdiction, but to seek stays or delays in ongoing litigation, and directed personnel to avoid referring to the Department of Justice new regulatory enforcement actions other than those affecting traditionally navigable waters.  Most applicable here, the guidance stated, "Corps personnel should not represent any Corps position on the effect of those decisions on Clean Water Act jurisdiction in court pleadings or in any sort of dealings with outside parties" until Corps Headquarters issues substantive guidance.  McCaulley Aff., Ex. 16.

The published guidance following <u>SWANCC</u> is inapplicable.  In <u>SWANCC</u>, the Supreme Court held that the Corps exceeded its authority in asserting jurisdiction over isolated waters serving as habitat for migratory birds.  However, at no time did the government rely on the "migratory bird rule" to assert jurisdiction over the affected area here.  Furthermore, the published guidance after <u>SWANCC</u> specifically states that "Field staff should continue to assert jurisdiction over traditional navigable waters (and adjacent wetlands) and, generally speaking, their tributary systems (and adjacent wetlands)."  68 Fed. Reg. at 1998.  This is the basis on which the government asserts its regulatory reach here.  Any failure by the government to point defendant to this published guidance does not justify a withdrawal of defendant's guilty plea.

Page 10 - OPINION AND ORDER

The internal guidance following <u>Rapanos</u> also does not support defendant's request.  The internal guidance was directed at Corps' staff and it was not something of which the United States Attorneys' Office was aware.  It asked only that staff delay making jurisdictional determinations, and delay representing the agencies' position about the regulatory reach of the CWA, while the Corps and EPA prepared substantive guidance about the effect of <u>Rapanos</u>.  The thrust of the guidance was to give the agencies an opportunity to digest the Supreme Court's decision.

I reject defendant's implication that this internal guidance is <u>Brady</u> material.  It is not exculpatory or impeachment "evidence [that is] material either to guilt or punishment which is favorable to the accused, irrespective of the good faith or bad faith of the prosecution."  <u>United States v. Hanna</u>, 55 F.3d 1456, 1459 (9th Cir. 1995).  It speaks only to the agency's hesitation in moving forward, for a short period, prior to forming a cohesive policy on jurisdictional questions after <u>Rapanos</u>.  The United States Attorneys' Office experienced the same hesitation, and in plea negotiations concluded that federal jurisdiction did not attach to the "northern site."  Defendant and his counsel similarly evaluated the case and determined that it was in defendant's best interest to plead guilty to a misdemeanor.

Defendant has failed to meet his burden of demonstrating the withholding of these guidance documents constitutes a fair and just reason supporting withdrawal of his guilty plea.

III.    <u>Whether the Federal Government has Jurisdiction Over the Affected Area Under Rapanos</u>

As I stated above, although I do not believe this to be an issue that goes to the court's subject matter jurisdiction, in an abundance of caution, I now evaluate whether defendant's

discharge of dredge and fill material over the course of almost three years took place in a wetlands over which the federal government has jurisdiction, as clarified by Rapanos.

As I noted above, jurisdiction under the CWA extends to "waters of the United States," which has in turn been defined by the Corps to mean waters "currently used or . . . used in the past, or . . . susceptible to use in interstate or foreign commerce;" tributaries of such waters; and wetlands adjacent to these waters. 33 CFR § 328.3(a)(1), (5), and (7). "Adjacent" is defined to mean wetlands "bordering, contiguous [to], or neighboring" waters of the United States. 33 C.F.R. § 328.3(c).

The Court examined the language of the statute in Rapanos, but did not provide a majority opinion. Accordingly, the Ninth Circuit has opined that Justice Kennedy's opinion, concurring only in the judgment, is the "narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases." Northern California River Watch v. City of Healdsburg, 496 F.3d 993, 999-1000 (9th Cir. 2007) (citing United States v. Gerke, 464 F.3d 723, 724 (7th Cir. 2006) and Rapanos, 126 S. Ct. at 2265 n.13 (Stevens, J., dissenting)). As a result, Justice Kennedy's opinion "provides the controlling rule of law for our case." River Watch, 496 F.3d at 999-1000. I, too, apply the test set out by Justice Kennedy.

According to Justice Kennedy, "waters of the United States" include isolated wetlands or wetlands adjacent to a non-navigable tributary if the wetlands "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." Rapanos, 126 S. Ct. at 2236 (Kennedy, J., concurring). He discussed what he meant by "significant nexus" as follows:

Accordingly, wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

Id. at 2248.

    A.    <u>Whether the Affected Area is a Wetlands</u>

Defendant disputes that the government properly evaluated the affected area to determine whether the area constitutes a wetlands.

Wetlands are defined to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). In implementing this definition, the Corps adopted the 1987 Corps of Engineer's Wetland Delineation Manual. The 1987 Manual requires that three parameters be met in order for an area to be designated a wetlands: (1) hydrophytic vegetation; (2) hydric soils; and (3) wetland hydrology. Pursuant to the 1987 Manual, where a site is disturbed, alternative methods of obtaining indicators of the parameters may be used.

In this case, Goudzwaard took soil samples from an undisturbed area with similar topography adjacent to the disturbed area. He saw soil saturation from the ground surface to 12 inches deep, he saw reed canary grass and sedge, and concluded that the affected area is wetlands. He also compared aerial photographs from 1936 through 2004 and determined that the photographs depicted wetland conditions. Similarly, Veenstra examined the site on 29 occasions from June 2004 through July 2007. Based on her observation of dark soil with a sulfuric smell,

Page 13 - OPINION AND ORDER

standing water, a submerged excavator, and reed canary grass, she concluded that the area is wetlands as well.

First, defendant is right to raise questions about the Corps' preliminary jurisdictional determination.  The Corps did not identify on the form the kind of jurisdictional water to which the unnamed tributary was connected.  Veenstra testified that the form was properly completed, but when asked where she would put the mark she said that the waters would be "interstate waters," referring to 33 C.F.R. § 328.3(a)(2).  All of the waters at issue here, however, are located entirely in Oregon.  In contrast, in its briefing, the government contends the wetlands are adjacent to a tributary of waters "currently used or . . . used in the past, or . . . susceptible to use in interstate commerce," referring to 33 C.F.R. § 328.3(a)(1).  Despite this confusion, if I conclude that defendant has failed to raise significant questions about the government's jurisdiction over the affected area, which I deal with below, an improperly completed preliminary jurisdictional form is of no moment.

In addition, defendant has properly raised one legitimate problem with Goudzwaard's February 22, 2005 visit to the property when Goudzwaard analyzed the affected area to determine whether it was a wetland.  The visit occurred one month prior to the growing season. Although Goudzwaard testified that a delineation or determination could be done at any time, the 1987 Manual is clear that, "Hydrology is often the least exact of the parameters, and indicators of wetland hydrology are sometimes difficult to find in the field. However, it is essential to establish that a wetlands is periodically inundated or has saturated soils **during the growing season**." 1987 Corps of Engineers Wetland Delineation Manual 29 (1987), http://el.erdc.usace.army.mil/

Page 14 - OPINION AND ORDER

elpubs/pdf/wlman87.pdf (emphasis added).  Following this guidance, the growing season starts March 24, just as defendant argues.

Nevertheless, Veenstra discovered during her site visit in June of 2004, plumb in the middle of the growing season, an excavator buried up to its cab in a hole filled with water.  She also observed other holes approximately 20 inches in diameter filled with standing water.  The 1987 Manual permits a conclusion about hydrology, which can be determined by visual observation, based on whether "[t]he area is inundated either permanently or periodically at mean water depths of ≤ 6.6 ft, or the soil is saturated to the surface at some time during the growing season of the prevalent vegetation."  Id. at 10, 31-32.  Veenstra opines in her affidavit that, based on her site visits, the disturbed site contains the hydrology necessary to constitute a wetlands.

Defendant does not challenge Veenstra's conclusion, based on her many site visits, that the disturbed area is a wetlands.  Furthermore, defendant has not produced any evidence that the affected area is not a wetlands under the 1987 Manual.

Finally, defendant makes much of Goudzwaard's assertion in his affidavit that the affected area is approximately 400 feet by 200 feet, contending that 200 feet from the lip of the ditch contains non-hydric soils.  Goudzwaard's actual measurements at the site, however, established 178 feet as being the longest distance from the lip, and it was from this and other measurements at the site that Goudzwaard calculated the affected acreage to be 1.33 acres.  His calculation comports with Veenstra's initial observation in 2004 that defendant had disturbed approximately one acre of wetlands.  Both observations occurred before the restoration work began in August of 2006.  Defendant's criticism of Goudzwaard's descriptive estimation of the size of the disturbance is not persuasive.

Page 15 - OPINION AND ORDER

In sum, after reviewing defendant's arguments and evidence, I conclude he has failed to meet his burden of showing that this is a fair and just basis on which to withdraw his plea.[1]

B.    Status of the Unnamed Tributary

Defendant argues that what the government calls an unnamed tributary is a man-made ditch. Defendant relies on an aerial photograph from 1936 which he claims demonstrates the ditch was recently dug because it depicts sidecast material. Defendant also contends the unnamed tributary goes dry in the summer, and in the winter and spring it carries excess water from the surrounding fields. On an Oregon Department of State Lands ("DSL") map, the ditch is labeled as "an unnamed intermittent stream." McCaulley Aff., Ex. 12 at 2.

The unnamed tributary to which the wetlands abut is approximately 10 feet wide and 3 feet deep. Corps personnel saw water flowing even in the summer. Veenstra testified that she had been to the site 29 times, over three and a half years, in almost every month of the year and she always saw water flowing in the unnamed tributary. McCaulley testified that he examined the unnamed tributary seven or eight times and had not always seen water. Specifically, in August at the area the parties call culvert #1, approximately two-thirds of a mile from the affected area, McCaulley had seen the unnamed tributary dry.

A 1923 Edition of a U.S. Geological Survey map shows the tributary as a naturally occurring stream/tributary to the Pudding River, not a man-made drainage ditch. Even if ditching or channelization occurred, such human activity does not change the jurisdictional status of the water. See United States v. Moses, 496 F.3d at 988 (9th Cir. 2007) (tributary rendered

---

[1]Marion County's conclusion that the affected area is not a wetlands, pursuant to regulations not provided by defendant, is neither binding nor persuasive evidence that the area is not a wetlands under the Corps' criteria.

intermittent by man-made diversion is within CWA jurisdiction); <u>Headwaters, Inc. v. Talent Irrigation Dist.</u>, 243 F.3d 526, 533 (9th Cir. 2001) (irrigation canals exchanging water with streams and a lake are tributaries and, as such, "the canals are 'waters of the United States'").

Pursuant to <u>Rapanos</u>, the fact that McCaulley noticed that no water was flowing at culvert #1 in August, two-thirds of a mile from the affected area, does not undermine the government's jurisdiction over the wetlands. McCaulley testified that he had never seen the unnamed tributary, where it abuts the affected area, to be completely dry, and never saw the unnamed tributary dry at any other place along its length. Veenstra testified that she checked culvert #1 on three occasions, in July of 2004, and in May and October of 2007, and the water was flowing at those times. This is not the "remote and insubstantial" drainage or ditch about which Justice Kennedy would be concerned. <u>Rapanos</u>, 126 S. Ct. at 2247. Indeed, Justice Kennedy observed that even an "intermittent flow can constitute a stream" and "the Corps can reasonably interpret the Act to cover the paths of such impermanent streams." <u>Id.</u> at 2243; <u>see also</u> <u>Moses</u>, 496 F.3d at 990.

Accordingly, I conclude any question about the permanence of the unnamed tributary does not raise a fair and just reason for defendant to withdraw his guilty plea.

C.    <u>Whether Unnamed Tributary Flows Into Navigable Water</u>

Defendant asserts that the Pudding is not navigable in fact.

The government acknowledges that the Pudding and Molalla are not formally listed as navigable riverways, but contends they are navigable based on a 1979 "Mollala [sic]-Pudding Rivers Navigability Study," conducted by the Oregon Division of State Lands ("DSL"). The study shows that from the late 1800s through the 1940s the Pudding River and its tributary streams were used to transport logs from harvest sites to mills, and the Molalla River was used

for this purpose from 1904 to 1914.  The Pudding River was used by a steamboat in the spring of 1860.  The government submitted evidence that kayakers use the Pudding River today.

Defendant argues that the 1979 Study was inconclusive about whether the Pudding was navigable, and that DSL did not recommend to the Oregon legislature that the Pudding be identified as a navigable water.

On the first point, defendant is incorrect.  The 1979 DSL study confirmed that the Pudding had been used for log transport from its mouth to river mile 26, and from the mouth of Silver Creek to river mile 48.6.  The study reported no evidence of log drives between river mile 26 and 48.6.

Defendant accurately points out, however, that DSL did not include the Pudding as a navigable water in its January 1983 Report and Recommendation on the Navigable Waters of Oregon ("Report and Recommendation"), a report DSL submitted to the Oregon legislature. Although there is no statement from DSL about why it did not include the Pudding on its list of navigable waters, as a general matter it is apparent that DSL had several concerns in mind and winnowed down the list to those waters for which it had substantial evidence of vessel navigation and commercial tourism, as well as log drives, for purposes of asserting title over the beds and banks of the waters.  For example, DSL "vigorously omitted" rivers that used splash dams for log drives even if drives at the beginning of the season, or drives early in the history of the state, did not require such assistance.  Report and Recommendation 20 (1983), http://www.oregon.gov/ DSL/NAV/docs/nav_waters_rpt.pdf.

Defendant also contends that because the Oregon legislature directed "[a]ny conclusion of [the Report and Recommendation] that a particular body of water is or is not navigable shall not

be considered evidence to prove or disprove the navigability" of any stream, this court cannot

consider the 1979 Mollala-Pudding Rivers Navigability Study.  See Supp. McCaulley Aff., Ex.

35 (Senate Bill 562, later codified as the preamble to ORS 274.036).  I reject this argument.

First, the legislature prohibited the use of a "conclusion" of navigability, not the evidence of

historical use that informed that conclusion.  Second, the legislature's prohibition specifically

references the Report and Recommendation and, although the report listed all of the waters that

DSL had studied, it did not incorporate the studies themselves.

In sum, where the unnamed tributary meets the Pudding River, the Pudding River is

approximately 100 feet wide.  The Pudding River flows year round.  The Pudding River flows 28

miles to the Molalla River, and the Molalla River flows 1.5 miles to the Willamette River.  The

unnamed tributary flows into the Pudding River near river mile 32.  The Pudding has been

confirmed to have been historically navigable in fact up to river mile 26, and from the mouth of

Silver Creek to river mile 48.6.  The Molalla was used to transport logs as well.  Defendant does

not dispute that kayakers use the Pudding River.  Paddling Oregon recommends the river for

canoes and small craft, and suggests that boaters put in at river mile 26.8.

I conclude defendant has failed to meet his burden of showing that this is a fair and just

basis on which to withdraw his plea.

D.    Whether a Significant Nexus Exists Between the Wetlands and the Pudding River

Defendant disputes that the wetlands significantly affect any navigable water.  Defendant

contends there is no permanent surface connection between the wetlands and the ditch.

Defendant chides the government for relying on a 1996 aerial photograph taken during the flood

of 1996, arguing that such a photograph (taken at the 100-year high water mark) does not comply

Page 19 - OPINION AND ORDER

with the Corps' own regulations which require a determination of jurisdiction based on the "ordinary high water mark."  Supp. McCaulley Aff., Ex. 26.  Defendant also highlights the *de minimus* size of the disturbance.

Additionally, according to defendant, the government does not explain how dredged and fill material would reach the Willamette 32 miles away, or even 1.75 miles to the Pudding.  The government asserts 7.1 cubic feet per second flow through the unnamed tributary, but it does not indicate the course of the water–i.e. how much of that water is from Tax Lot 1700.  The government's tests also measured the flow at 3.55 cubic feet per second.  The defendant contends it is doubtful that the flow reaches the Pudding since the area is in the middle of farm fields, many of which are "undoubtedly" irrigated from the ditch.

The government presented sufficient evidence to satisfy me that the unnamed tributary and the wetlands help protect the chemical, physical, and biological integrity of the navigable waters of the Pudding, the Molalla and the Willamette Rivers.  Furthermore, the government presented sufficient evidence that defendant's repeated disturbance of the wetlands, over the course of almost three years, affected the wetlands and surrounding areas.

Justice Kennedy explained that wetlands have the capacity to "filter and purify water draining into adjacent bodies of water" and "slow the flow of surface runoff into lakes, rivers, and streams and thus prevent flooding and erosion."  Rapanos, 126 S. Ct. at 2245 (Kennedy, J., concurring).  Filling wetlands can "increase downstream pollution" and "may cause the release of nutrients, toxins, and pathogens that were trapped, neutralized, and perhaps amenable to filtering or detoxification in the wetlands."  Id.  In short, he recognized that "wetlands can perform critical

functions related to the integrity of other waters–functions such as pollutant trapping, flood

control, and runoff storage." Id. at 2248.

Here, under Corps guidance, the wetlands is "adjacent" to the unnamed tributary because

it is bordering, contiguous or neighboring the channel.  In other words, there is no berm or other

physical feature separating the wetlands and the tributary, so rainwater, flood water and wetlands

waters flow directly to and from the bodies of water.

In 1996, the unnamed tributary flooded the wetlands.  Contrary to defendant's assertion,

relying on this photograph is not a violation of any Corps' guidance; the guidance to which

defendant refers deals with determining "ordinary high water marks" in the absence of adjacent

wetlands.  See Supp. McCaulley Aff., Ex. 26 at 2 n.2.  Furthermore, beyond the 1996 flood

event, the government points to a photograph of dredge and fill material spilling into the

unnamed tributary after defendant disturbed the wetlands.  The photograph depicts the unnamed

tributary at the level of the wetlands.  Govt. Ex.16.4, 16.15.  Indeed, defendant himself has

testified that the unnamed tributary has risen seasonally and washed away portions of his

backyard, and that one reason he built the rock wall was to keep his backyard from continuing to

wash away.

Where the unnamed tributary abuts the wetlands, the flow of water in the channel is

continuous–neither McCaulley nor Veenstra ever saw it dry.  Veenstra measured the flow to be

7.1 and 3.55 cubic feet per second, depending on how she calculated it.  As I described above,

the flow is relatively permanent–McCaulley observed the channel dry in August at only one

location.  The wetlands is only 1.75 miles from the Pudding River.

As I noted above, the disturbance was by no means *de minimus*. Goudzwaard took measurements at the site with a tape measure and later transposed the measurements to an enlarged aerial photograph, calculating the total area of impact with a planimeter. He concluded that 1.33 acres was disturbed. His calculation comports with Veenstra's initial observation in 2004 that defendant had disturbed approximately one acre of wetlands. McCaulley came to this conclusion after "examining the photographs and schematic drawings prepared by law enforcement officers at the time of the activity and the survey map" prepared by the remediation consultant. Supp. McCaulley Aff. ¶ 12f. Since Goudzwaard's measurement was obtained on site, and is consistent with Veenstra's, I reject defendant's argument that the disturbance was *de minimus*.

Veenstra photographed sediments pluming into the unnamed tributary from the wetlands as a result of defendant's excavation activity. Veenstra Aff. at ¶ 9. Goudzwaard explained, "Soil disturbance encourages downstream transportation of sediments" which can "require maintenance dredging in the future." Goudzwaard Aff. at ¶ 11. Defendant also destroyed vegetation, increasing the risk of erosion and reducing the wetlands' ability to filter sediments. Defendant disrupted the wetlands' "capacity of biofiltration, flood capabilities, and wildlife support." Id. at ¶ 12.

It is true that defendant confirmed with ODF&W that neither the unnamed tributary nor the Pudding River has been inventoried for fish presence. Similarly, the government produced no evidence, only "common sense" in the words of Veenstra, that defendant's buried excavators released any oil or other chemicals. The government submitted evidence, however, demonstrating that the Pudding River contains rearing habitat for spring Chinook and winter

steelhead.  Goudzwaard testified that soil disturbance negatively affects fish survival, as well as breeding, hiding and nesting cover.

Finally, the wetlands lie within the flat flood plain of the unnamed tributary. Goudzwaard opined that similar hydrological conditions, soil and vegetation existed at least a mile upstream and a mile downstream of the affected area.  McCaulley generally agreed with that.

In sum, given the status of the affected area as wetlands, its adjacency to the unnamed tributary, unseparated by any berm or other physical feature, the relatively permanent and continuous flow of the unnamed tributary to the navigable in fact Pudding River 1.75 miles away, together with the government's evidence of the importance of this wetland, especially in the context of the larger wetland system extending at least a mile in either direction, I find defendant has failed to raise a fair and just reason supporting withdrawal of his guilty plea.

IV.    Whether the Exemption for "Prior Converted Cropland" Applies

Defendant asserts that the wetlands is excluded from CWA jurisdiction because it is "prior converted cropland."  33 C.F.R. § 328.3(a)(8).  As set forth above, CWA jurisdiction extends over "waters of the United States."  The Corps, however, has further defined that jurisdictional term as follows,

> Waters of the United States do not include **prior converted cropland**. Notwithstanding the determination of an area's status as prior converted cropland by any other Federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.

33 C.F.R. § 328.3(a)(8) (emphasis added).

Defendant does not explain how his failure to investigate the application of this exemption constitutes a "fair and just reason" justifying withdrawal of his guilty plea. The exemption was not affected by any of the guidance discussed earlier, and was not affected by the Rapanos decision. Nevertheless, even if, as defendant argues, the status of the affected area as prior converted cropland goes to this court's subject matter jurisdiction, the law does not support his argument that the wetlands is beyond the reach of the CWA.

The Corps adopted the "prior converted cropland" exemption to "clarify which areas in agricultural crop production would not be regulated as waters of the United States." 58 Fed. Reg. 45,008 (August 25, 1993). The amendment attempted to bring the CWA in line with the way agricultural lands were regulated under the Food Security Act of 1985 ("FSA"). 16 U.S.C. Chapter 58. Under the FSA, or Swampbuster Act, farmers lost their farm subsidies if they converted their wetlands to farmland. Farmers maintained their farm subsidies, however, if they continued to farm previously cropped wetlands because the Act recognized that such cropland no longer retained the ecological value of wetlands.

EPA and the Corps did not define the term "prior converted cropland" in the regulation, but instead relied on the definition in "the National Food Security Act Manual published by the Soil Conservation Service." 58 Fed. Reg. at 45,031. The agencies also accepted the Soil Conservation Service's ("SCS") concept of abandonment, "thereby ensuring that PC cropland that is abandoned within the meaning of those provisions and which exhibit wetlands characteristics will be considered wetlands subject to Section 404 regulation." Id. at 45,034. The SCS considered prior converted cropland to be abandoned if it was not used for the production of an agricultural commodity every five years. Id.

Page 24 - OPINION AND ORDER

In 1996, Congress enacted the FAIRA amendments, revising the FSA, to ensure that farmers would not lose their program loans or payments, even if they did not continuously till the soil. So long as they produce an "agricultural commodity" on a wetlands that is cropland before December 23, 1985 (the effective date of the FSA), and so long as the "Secretary determines the wetland characteristics returned after that date" as a result of lack of maintenance, management or circumstances beyond the control of the person, the farmer will maintain subsidies. 16 U.S.C. § 3822(b)(1)(G). Additionally, the FAIRA amendments protect farmers' loans or payments even if they convert "[a] wetland previously identified as a converted wetland (if the original conversion of the wetland was commenced before December 23, 1985), but that the Secretary determines returned to wetland status after that date" due to lack of maintenance, management or circumstances beyond the person's control. 16 U.S.C. § 3822(b)(2)(D).

The NRCS (formerly the SCS) adopted regulations to implement the FAIRA amendments.

> Prior-converted cropland is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity had been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support woody vegetation and met the following hydrologic criteria:
>
> (i) Inundation was less than 15 consecutive days during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more); and
>
> (ii) If a pothole, playa or pocosin, ponding was less than 7 consecutive days during the growing season in most years (50 percent chance or more) and saturation was less than 14 consecutive days during the growing season most years (50 percent chance or more)[.]

7 C.F.R. § 12.2(a)(8).

Page 25 - OPINION AND ORDER

The agency explained that the FAIRA amendments were intended to "revise[] the concept of 'abandonment' to ensure that as long as land is used for agriculture, a certified prior converted cropland designation remains in effect."  61 Fed. Reg. 52,664, 52,669 (Oct. 7, 1996); see also 61 Fed. Reg. 47,019, 47,021 (Sept. 6, 2006) ("[e]nsures that wetlands that were certified as prior-converted cropland will continue to be considered prior-converted cropland even if wetland characteristics return . . . provided the prior-converted cropland continues to be used for agricultural purposes.").

Defendant provides argument and evidence that Tax Lot 1700 is prior converted cropland.  Tax Lot 1700 is zoned Exclusive Farm Use, and Marion County has identified the area as Goal 3 agricultural lands in its Comprehensive Plan.  The affected area is included in the Mt. Angel Drainage District, which is now the Marion County Drainage District.

 Defendant has multiple reports that prior owners grew squash, corn, and pickles, to give only a few examples, on the property since at least the 1940's.  George Kushnick[2] told McCaulley that he personally helped to install cedar boxing to drain the property, prior to December 23, 1985, and that his uncle, Hans Kushnick, farmed the site until his death.[3] The most recent report of agricultural activity came from McCaulley's interview with Joanne Kuehn.  Kuehn reported that her grandmother, Anna McGuire, had the property planted with mint, and farmed it continuously until her death in 1987.  McCaulley admits that Kuehn may not have differentiated between the property behind defendant's home and the property south of the home, which is the

[2]The parties also spell the name Kuschnik.  I will utilize the spelling contained in McCaulley's affidavit.

[3]Defendant does not give the year of Hans Kushnick's death, but McCaulley's notes appear to indicate that he died in 1978 or 1979.

affected area at issue here.  He thinks he called Kuehn back to confirm that the wetlands had

been farmed, and remembers Kuehn was "startled" to learn that the defendant's property did not

include the unnamed tributary.  In addition, defendant contends, without dispute from the

government,  that the lands are not inundated 15 consecutive days during the growing season.

According to defendant, pursuant to United States v. Hallmark, 30 F. Supp. 2d 1033 (N.D. Ill.

1998), a case involving property that had been farmed from 1969 to 1988 without a prior

converted cropland certification from NRCS, the affected area is prior converted cropland which

is not "waters of the United States."

       Defendant's evidence that an agricultural commodity was produced on the affected area

as of December 23, 1985 is very slight, but the government has no evidence to the contrary.

Nevertheless, even if the wetlands had been farmed as of December 23, 1985, and it returned to

wetlands after that date, there is no question that any agricultural production has been

abandoned.[4]  Defendant argues that the FAIRA amendments did away with the concept of

abandonment.  That may be true for purposes of any farm subsidies defendant may seek, but it is

not true for purposes of the CWA.  The Corps' regulation is clear that the "final authority

regarding Clean Water Act jurisdiction" remains with the EPA, and the Corps for day-to-day

administration of the Section 404 program.  33 C.F.R. § 328.3(a)(8).

       Indeed, in 2001, the Corps' Portland District issued Operating Procedures for Completing

Wetland Delineations/Determinations on Agricultural Land in Oregon which directs Corps

personnel to assert jurisdiction over prior converted cropland where "[a]n area is not enrolled in a

---

[4]Indeed, as defendant represents in his reply, his "contention regarding PCC has always
been that the area had been converted to farm use by prior owners well before December 1985."
Reply at 22 n. 18.

typical rotational, set-aside program . . . <u>and</u> [t]he area is abandoned . . . <u>and</u> [w]etland criteria are

met."  Goudzwaard Aff., Ex. 7 at 3.[5]  "Abandoned" is defined to mean "[m]anagement . . .

related to food or fiber production has ceased for 5 consecutive years and the parcel no longer

remains in agricultural use (i.e. is considered abandoned)."  <u>Id.</u>[6]

     Finally, even the NRCS has explained,

> While most PC areas have been extensively manipulated and drained, and
> are therefore no longer wetlands, a PC area may meet the Corps' wetlands
> hydrology criterion.  Production of an agricultural commodity or maintenance or
> improvement of drainage systems on the PC area is exempt from the swampbuster
> provisions.  However, if the land changes to a non-agricultural use, or is
> abandoned, according to the criteria established by the Corps and EPA, it may be
> regulated under the CWA.

Fact Sheet, Certified Wetland Determinations,  http://www.nrcs.usda.gov/programs/compliance/

WC-files/SWAMP-CertFct-2005.pdf.  Furthermore, in withdrawing from the 1994 Memorandum

of Agreement to which the Departments of Agriculture, Interior, Army and the Environmental

Protection Agency were party, the NRCS explained, "1996 amendments eliminated the concept

of 'abandonment' for prior converted (PC) cropland.  As a result, land may be considered non-

wetlands for Swampbuster purposes, and wetland for CWA purposes." Guidance on Conducting

Wetland Determinations for the Food Security Act and Section 404 of the Clean Water Act 2

(2005) http://www.nrcs.usda.gov/programs/compliance/pdf_files/

------

[5]The page is not numbered, but it is the third page in Exhibit 7.

[6]This position is consistent with other Corps' statements.  In explaining the adoption of
new and modified Nationwide Permits (NWPs), the Corps explained, "The new and modified
NWPs do not need to address impacts to prior converted cropland, since these areas are not
waters of the United States.  If prior converted cropland is abandoned and reverts back to
jurisdictional wetlands, then those areas are subject to the permit requirements of Section 404 of
the Clean Water Act." 65 Fed. Reg. 12,818, 12,841 (Mar. 9, 2000).

2-28-05_NewGuidance_Wet_Det.pdf.

In sum, although the defendant has presented some evidence that agricultural activity occurred on the wetlands as of December 23, 1985, the defendant has failed to demonstrate that he did not abandon the agricultural activity. Accordingly, defendant has not met his burden of raising a just and fair reason for withdrawing his guilty plea.

## CONCLUSION

For the foregoing reasons, I deny defendant's Motion to Withdraw Guilty Plea (#85).

IT IS SO ORDERED.

Dated this _____21st_____ day of December, 2007.


     /s/ Garr M. King
Garr M. King
United States District Judge